**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RESS LIFE INVESTMENTS A/S,<br>Plaintiff,<br>v.<br>OLF RS HOLDCO, LLC et al.,<br>Defendants, and<br>WILMINGTON TRUST, N.A.,<br>Nominal Defendant. | Civil Action No. 26-cv-07261 (JSR) |
| OLF RS HOLDCO, LLC and RS 4 SPV LLC,<br>Counterclaim Plaintiffs,<br>v.<br>RESS LIFE INVESTMENTS A/S,<br>Counterclaim Defendant. | (Formerly Civil Action No. 26-cv-07823, now consolidated with Civil Action No. 26-cv-07261 (JSR)) |

# OBRA PARTIES' AMENDED COUNTERCLAIM COMPLAINT

Counterclaim Plaintiffs OLF RS Holdco, LLC ("Holdco") and RS 4 SPV LLC ("RS4" and, together with Holdco, the "Obra Parties"), by their attorneys, King & Spalding LLP, as and for their amended complaint against Counterclaim Defendant Ress Life Investments A/S ("Ress"), allege upon knowledge as to themselves and otherwise upon information and belief as follows:

## NATURE OF ACTION

1. The Obra Parties entered into a contract with Ress to purchase, in tranches over a year-and-a-half period, a portfolio of life insurance policies, through a carefully negotiated, arm's-length transaction between sophisticated parties. For its own business reasons, Ress chose to sell

the insurance policies to the Obra Parties in a transaction in which it would receive, in total, $165 million in cash paid in seven tranches plus the potential for additional earnout payments, and in which the Obra Parties expected a return of capital plus 13% annually. Ress did not want to receive the purchase price in a single installment but instead sought to have an extended tranche-by-tranche series of sales. The Obra Parties accommodated that request.

2. Having received $144,375,000 in payments over more than a year, Ress now is unhappy with the deal that it made, and it has refused to honor its remaining obligations under the contract. Specifically, in August 2026, after having paid Ress in full for the first five tranches of policies, Holdco paid Ress $20,625,000 for the sixth tranche of policies (the total amount due for that tranche). Ress took the money and kept the policies. It never executed the entitlement order, never transferred a single policy in that tranche, and never returned a dollar of the payment. It then purported to "terminate" the contract and thus improperly repudiated its obligation to sell the seventh (final) tranche of policies scheduled for September 2026. In other words, for over two months, Ress has retained $20,625,000 of Holdco's money but has refused to deliver what the Obra Parties paid for and made clear it would not honor any future obligations.

3. Then, with remarkable audacity, while still sitting on both the $20,625,000 payment and the policies it was paid to deliver, Ress sued the Obra Parties (and their parent entity) to rescind the contract in an effort to unwind the deal entirely. Ress's lawsuit is predicated on a pretextual (and non-existent) "misrepresentation" by the Obra Parties pertaining to RS4's entity structure and formation documents—a purported "misrepresentation" that the Obra Parties deny entirely and that, in any event, has not caused any harm whatsoever to Ress and could not in any way serve as a legitimate basis for Ress's actions. Ress's conduct amounts to taking the Obra Parties' money, refusing to deliver what was paid for, and then asking the Court to let it keep the rest of the bargain,

too.

4. The parties' bargain was straightforward. Pursuant to the April 28, 2025 Life Insurance Policy Purchase and Sale Agreement (the "PSA"), Ress agreed to sell a portfolio of life insurance policies to Holdco in a series of quarterly transactions, each effected through entitlement orders.

5. The PSA was subsequently amended on August 11, 2025 by an Amendment, Consent and Reaffirmation (the "Amendment"), pursuant to which RS4 assumed, jointly and severally with Holdco, Holdco's obligations.

6. Following each payment by Holdco for the first five groups of policies, Ress executed—on the same day or the next day—the corresponding entitlement order for the group. Ress also shared information about premium payments and maturity income received for the ongoing true-ups required under the agreement. But the sixth scheduled closing was different. Although the Obra Parties tendered the required $20,625,000 on August 18, 2026, Ress refused to transfer the corresponding life insurance policies (but it kept the money).

7. Days later, on August 21, 2026 (in a letter dated August 19, 2026), Ress purported to terminate the parties' agreement without any reference to the payment it had just received, without transferring title to the insurance policies for which the Obra Parties made that payment, and without any reference to the seventh closing scheduled for September 2026.

8. Ress's purported termination has no basis under the PSA. Apart from bankruptcy, the only ground on which the PSA permits Ress to terminate is an uncured material default by the Purchaser in the performance of its obligations—that is, a material default that the Purchaser fails to cure within twenty days after receiving written notice. But there was never an uncured material default by the Obra Parties. Holdco paid the full amount due—$20,625,000—on August 18, 2026,

during the contractually prescribed cure period. The Obra Parties deny the remaining alleged breaches—an alleged inaccuracy in a representation about the structure of RS4 as a special purpose entity and an alleged failure to maintain access to sufficient available funds—and, in any event, they are not uncured "material defaults" in the performance of the Obra Parties' obligations within the meaning of the PSA (as set forth in Section 6.3). If an alleged breach does not constitute such an uncured material default, Ress's contractual remedy is limited as provided by Article 8 of the PSA.

9. The only party in material default is Ress. Ress refused to execute the entitlement order and transfer the sixth tranche of policies ("Policy Group 6") after accepting payment, purported to terminate the PSA, and failed to cure within twenty days after receiving the Obra Parties' notice of default. Those breaches of Ress's obligations caused the Obra Parties to suffer significant harm.

10. And Ress has since compounded the harm. It demanded that the Obra Parties "unwind" the transaction, and it has sued to rescind the PSA altogether—a remedy that would strip the Obra Parties of every policy they bought, including policies for which they already paid Ress $123,750,000 (the full price for those policies). Ress's purported termination, its demand to unwind the transaction, and its claimed right to recover the policies previously transferred to the Obra Parties have impaired the liquidity and marketability, and therefore the value, of those policies—harm that flows directly from Ress's breaches of the PSA.

11. In purporting to terminate the PSA in August 2026—after stating that it would "suspend performance" and demanding that the Obra Parties "unwind this transaction"—and by refusing to transfer Policy Group 6 despite receiving payment and thereafter suing to rescind the PSA, Ress made clear that it would not perform any obligations thereafter, including the

obligation to sell the seventh tranche of policies at the closing scheduled for September 30, 2026.

12. The Obra Parties thus bring this action seeking (1) return of the $20,625,000 that Holdco paid for Policy Group 6, which has not been transferred, or, in the alternative, recoverable expectation damages for Ress's failure to transfer Policy Group 6, together with recoverable expectation damages for Ress's repudiation of its obligation to transfer Policy Group 7; (2) direct damages for Ress's other breaches of the PSA, including its failure to perform its obligations under Article 5, and the Obra Parties' attorneys' fees and expenses recoverable under the PSA and applicable law; and (3) a declaratory judgment that Ress's purported termination was invalid and that Ress has no right to rescind the PSA or to reclaim the policies that the Obra Parties rightfully own.

## THE PARTIES

13. OLF RS Holdco, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 437 Madison Avenue, 26th Floor, New York, New York 10022. Holdco is a wholly owned subsidiary of OLF (defined below).

14. RS 4 SPV LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 437 Madison Avenue, 26th Floor, New York, New York 10022. RS4 is a wholly owned subsidiary of Holdco.

15. Ress Life Investments A/S is a publicly traded company, listed on the NASDAQ Nordic exchange and organized under the laws of Denmark, with its principal place of business located at Nybrogade 12, DK-1203 Copenhagen K, Denmark.

## JURISDICTION AND VENUE

16. The Obra Parties commenced this action in the Supreme Court of the State of New York, County of New York. On September 9, 2026, Ress filed, in this Court, a notice of removal

of the action to this Court, alleging that the Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). On September 14, 2026, Ress filed, in the state court, a notification of its notice of removal. Upon removal, the case was assigned Civil Action No. 26-cv-07823 and has since been consolidated with Civil Action No. 26-cv-07261 (JSR).

17. This Court has jurisdiction over Ress because Ress consented to the exclusive jurisdiction of the federal and state courts sitting in New York pursuant to Section 10.2(b) of the PSA, which provides that "EACH OF THE PARTIES HERETO IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY FEDERAL OR STATE COURT SITTING IN NEW YORK, NEW YORK, IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT." Further, Ress voluntarily removed this action to this Court and has not subsequently challenged, disputed, or otherwise objected to the Court's exercise of personal jurisdiction.

18. Venue is proper in this District under 28 U.S.C. § 1441(a) because this District embraces New York County, where the action was pending when Ress removed it. Venue is also proper because Section 10.2(b) of the PSA provides for venue in this county, and because the Obra Parties maintain their principal offices at 437 Madison Avenue, New York, New York 10022.

19. The PSA is governed by New York law pursuant to Section 10.2(a) of the PSA.

20. The parties have waived trial by jury pursuant to Section 10.2(c) of the PSA.

## FACTUAL ALLEGATIONS

### A. *The PSA and the Structure of the Transaction*

21. On April 28, 2025, Holdco and Ress (defined as "Purchaser" and "Seller," respectively) entered into the PSA, under which Ress agreed to sell, and Holdco agreed to purchase, a portfolio of life insurance policies.

22. Ress disclosed the transaction in a press release and its public filings.

23. Ress initially sought a purchase price of roughly $280 million for the policies. Holdco would not agree to that purchase price, but it did agree to pay $165 million in cash, with the understanding that once Holdco recovered its investment plus a 13% annual return on its investment, it would pay additional consideration in the form of an earnout. Ress agreed to that.

24. The total consideration for the policies thus consisted of (a) an initial payment, referred to in the PSA as the "MRA Purchase Price," of $41,250,000 (the "MRA Payment"), which had been previously paid by Holdco as part of a short-term repurchase arrangement, and (b) six quarterly installments of $20,625,000 each (each, a "Quarterly Payment Amount"), for an aggregate purchase price of $165 million (plus the potential for certain future earnout payments if proceeds from the policies exceeded certain thresholds—a contingency that has not occurred).

25. At Ress's request, the PSA established a structured transfer mechanism: on each Quarterly Payment Date, Holdco would pay Ress the Quarterly Payment Amount. The first payment in the series was the MRA Payment, which came in the first quarter of 2025, with subsequent Quarterly Payment Dates falling at the end of each successive calendar quarter, as set forth in Schedule B to the PSA.

26. Section 4.1 of the PSA provides that, upon receipt of the Quarterly Payment Amount, Ress "shall send . . . the completed and duly executed Entitlement Order" and deliver to Holdco electronic copies of the Sales Documentation Package and Policy Documents for the corresponding group of life insurance policies (each, a "Policy Group"). Wilmington Trust, N.A. ("Wilmington Trust") acts as securities intermediary for both Ress and Holdco. Section 4.2 further provides that Ress shall cause the transfer of such policies to Holdco, as follows:

> With respect to the Policies being sold hereunder, on each Policy Closing Date, the Purchaser's Securities Intermediary shall deliver

to the Seller the Quarterly Payment Amount for the Policies for which legal and beneficial ownership shall transfer to Purchaser as of the related Policy Closing Date, and the Seller shall cause Seller's Securities Intermediary, as the record owner of the relevant Policies and against payment therefor, to debit such Policies from the Seller's Securities Account and credit such Policies to the Purchaser's Securities Account, in each case in accordance with the Entitlement Order.

Schedule B to the PSA sets forth the schedule for each transaction:

**SCHEDULE B**

**POLICY SCHEDULE**

| Quarterly Payment Date | Policy Closing Date | Policy Group | Portfolio Ownership Percentage |
|---|---|---|---|
| Effective Date | Effective Date | Policy Group 1 | 25% |
| June 30, 2025 | June 30, 2025 | Policy Group 2 | 37.5% |
| September 30, 2025 | September 30, 2025 | Policy Group 3 | 50.0% |
| December 30, 2025 | December 30, 2025 | Policy Group 4 | 62.5% |
| March 30, 2026 | March 30, 2026 | Policy Group 5 | 75.0% |
| June 30, 2026 | June 30, 2026 | Policy Group 6 | 87.5% |
| September 30, 2026 | September 30, 2026 | Policy Group 7 | 100.0% |

27. The PSA also expressly sets forth the parties' respective termination rights. Section 6.2 provides that Holdco may terminate the PSA by written notice upon "material default by Seller in the performance of its obligations under this Agreement that Seller fails to cure within twenty (20) days after Seller has received written notice of such default."

28. Section 6.3 provides that Ress may terminate the PSA by written notice upon "material default by Purchaser in the performance of its obligations under this Agreement that Purchaser fails to cure within twenty (20) days after Purchaser has received written notice of such default."

29. Accordingly, apart from bankruptcy, the only ground identified in Section 6.3 on

which Ress may terminate the PSA is an uncured material default by the Purchaser in the performance of its obligations, and Ress may exercise that right only if the Purchaser fails to cure the material default within twenty days after receiving written notice of it.

**B.** ***The August 2025 Amendment to the PSA***

30. On August 11, 2025, the parties, along with Obra Longevity Fund, L.P. ("OLF"),[1] entered into the Amendment, which modified the terms of the PSA.

31. The PSA prohibits Holdco from transferring any portion of the purchased policies to an affiliate without Ress's written consent. In the Amendment, Ress expressly consented to Holdco's transfer of the purchased policies to RS4, Holdco's wholly owned subsidiary.

32. Pursuant to the Amendment, RS4 assumed jointly and severally with Holdco all duties and obligations of Holdco under the PSA, and OLF provided an absolute, unconditional, and irrevocable parent guarantee of all of the Purchaser's obligations.

33. In the Amendment, the Obra Parties and OLF made certain representations and warranties, including a representation regarding RS4's organizational structure as a special purpose entity (the "SPE Representation"). The Amendment also amended Section 9.13 of the PSA, which, as amended, requires the Purchaser to "at all times maintain sufficient cash or cash equivalents on hand or have readily available to it to satisfy all of its obligations as they come due" (the "Cash Covenant").

34. In connection with the transaction, the Obra Parties obtained financing for the transaction that was secured by certain of the purchased life insurance policies.

35. The PSA expressly contemplates such financing. Schedule A to the PSA defines "Permitted Lien" to include, "with respect to any asset or property, (a) any Lien created thereon

[1] After the Amendment was executed, OLF was renamed Obra Insurance Fund, L.P. ("OIF"). OLF (now OIF) is the ultimate parent company of Holdco and RS4.

pursuant to this Agreement . . . and (b) any Lien created thereon by or through Purchaser." Section 7.1(s) of the PSA, in turn, provides that upon each Policy Closing Date and payment of the Quarterly Payment Amount, "the Purchaser will have good, valid and marketable title to all the Policies and the Purchased Assets, in each case free and clear of all Liens other than Permitted Liens." To the extent the lien securing the Obra Parties' financing was created by or through the Purchaser, it is a Permitted Lien within the meaning of Schedule A and Section 7.1(s) of the PSA.

**C. *The Obra Parties Performed Their Obligations Under the PSA***

36. From June 30, 2025 through May 1, 2026, four quarterly closings were successfully completed under the PSA. On each occasion, Holdco tendered the Quarterly Payment Amount (in some cases in two installments) and delivered an Entitlement Order executed by Holdco, and Ress executed the Entitlement Order and caused the transfer of the corresponding Policy Group to Holdco. The complete payment history through Policy Group 5 is as follows:

| Date | Amount | Policy Group | Entitlement Order Status |
|---|---|---|---|
| Jan. 30, 2025 | $41,250,000 | Policy Group 1 (MRA) | Completed |
| June 30, 2025 | $20,625,000 | Policy Group 2 | Completed |
| Sept. 30, 2025 | $20,625,000 | Policy Group 3 | Completed |
| Jan. 2, 2026 | $11,000,000 | Policy Group 4a | Completed |
| Jan. 26, 2026 | $9,625,000 | Policy Group 4b | Completed |
| Mar. 31, 2026 | $10,312,500 | Policy Group 5a | Completed |
| May 1, 2026 | $10,312,500 | Policy Group 5b | Completed |
| **Total** | **$123,750,000** | | |

37. As the table above reflects, the Obra Parties paid a total of $123,750,000 to Ress

for Policy Groups 1 through 5, including the MRA Payment, and Holdco purchased every tranche of policies scheduled to close under the PSA before June 30, 2026. While certain payments were split into sub-payments or made after the stated Quarterly Payment Date, Ress accepted those payments and executed the respective Entitlement Orders without objection or reservation of rights.

**D. *Negotiation of a Second Amendment and Ress's Default Notice***

38. The fifth quarterly payment (the sixth overall payment) of $20,625,000 was due on June 30, 2026.

39. Although the Obra Parties did not make the payment for Policy Group 6 on June 30, 2026 (and did not acquire the Policy Group 6 assets), the parties to the PSA began negotiating a potential further amendment to the PSA that would have altered the payment date.

40. During negotiations on the proposed second amendment, Ress introduced the concept of a repurchase of all policies at their accrued value.

41. By late July 2026, negotiations over the proposed second amendment stalled, and on July 29, 2026, Ress issued a notice of default to Holdco, RS4, and OLF (the "Ress Default Notice"). The Ress Default Notice asserted three purported grounds for default: (a) payment default under Section 2.7 of the PSA for the unpaid fifth Quarterly Payment due June 30, 2026 (and the timing of earlier payments); (b) breach of Section 9.13 of the PSA (i.e., the Cash Covenant); and (c) breach of the SPE Representation in the Amendment regarding the organizational structure of RS4.

42. The Ress Default Notice stated Ress's intention to immediately "suspend performance" of its obligations under the PSA and demanded that the Obra Parties take steps to "unwind this transaction and restore Ress to the status quo ante."

43. The Ress Default Notice triggered the twenty-day cure period under Section 6.3 of the PSA, which runs from the Obra Parties' receipt of the notice. The Ress Default Notice is dated July 29, 2026, and the Obra Parties could not have received it before that date. Accordingly, the cure period had not expired when Holdco made its payment on August 18, 2026.

**E. *The Obra Parties Negotiated with Ress in Good Faith***

44. The Obra Parties attempted to engage with Ress in good faith to resolve the dispute, while Ress sought to impose unreasonable conditions on any resolution.

45. Between August 3 and August 17, 2026, the parties engaged in discussions and correspondence in an effort to resolve the dispute. During this period, the Obra Parties responded substantively and in good faith to each of Ress's communications, proposed a framework to facilitate a constructive resolution, and repeatedly followed up with Ress requesting engagement on the proposed framework. Ress, by contrast, imposed escalating and unreasonable demands as prerequisites to further discussion (demands going far beyond any contractual entitlements under the PSA), refused to engage on the Obra Parties' proposed framework, and ultimately accused the Obra Parties of a "continuing lack of good faith"—despite the Obra Parties' consistent willingness to negotiate.

**F. *The Obra Parties Timely Cured***

46. On August 18, 2026—before the twenty-day cure period under Section 6.3 of the PSA had expired—Holdco wired the full $20,625,000 Quarterly Payment Amount to Ress's account at Wilmington Trust. Simultaneously, the Obra Parties delivered to Ress an Entitlement Order executed by Holdco and tendered to Ress for its execution for the transfer of Policy Group 6.

47. By doing so, Holdco fully cured, through payment, the June 30, 2026 payment

default asserted by Ress before the contractual cure period expired. Separately, Holdco tendered the remaining performance within its control by delivering to Ress an Entitlement Order executed by Holdco and tendered to Ress for its execution. Section 4.1 provides for payment to "Seller's Securities Intermediary in immediately available funds via wire transfer to an account designated by Seller," and the payment was wired to Ress's account at Wilmington Trust. The cure payment had both legal and practical significance: legally, it extinguished any termination right Ress may have had based on the alleged payment default, while practically, it demonstrated that the Obra Parties had the ability and willingness to continue performing under the PSA. Completion of the Entitlement Order and the corresponding transfer of Policy Group 6 required Ress's cooperation, including its execution of the Entitlement Order.

48. Under Section 4.1 of the PSA, Ress was obligated to execute the Entitlement Order and cause the transfer of Policy Group 6 to Holdco, "upon receipt" of Holdco's August 18, 2026 payment.

49. Ress was thus obligated to execute the Entitlement Order for Policy Group 6 on August 18, 2026.

50. Consistent with the parties' prior course of dealing (as discussed further below), Ress should have executed the Entitlement Order for Policy Group 6 no later than one day after Holdco made its payment—that is, no later than August 19, 2026.

51. And Ress was obligated to transfer, or cause the transfer of, Policy Group 6 to Holdco on August 18, 2026.

52. Consistent with the parties' prior course of dealing (as discussed further below), Ress should have transferred, or caused the transfer of, Policy Group 6 to Holdco no later than one day after Holdco made its payment—that is, no later than August 19, 2026.

### G. *Ress Refused to Transfer the Policies*

53. Ress never executed the Entitlement Order for Policy Group 6.

54. Ress never transferred, or caused the transfer of, Policy Group 6 to Holdco.

55. Ress retained Holdco's August 18, 2026 payment of $20,625,000.

56. Ress never returned, or caused the return of, Holdco's August 18, 2026 payment of $20,625,000.

57. The Entitlement Order is a jointly executed instrument, and the concurrent closing contemplated by Section 4.2—under which Wilmington Trust, as securities intermediary for both parties, debits the policies from Ress's securities account and credits them to Holdco's securities account against payment—cannot be completed without Ress's execution of the Entitlement Order. Ress's refusal to execute the Entitlement Order therefore prevented completion of both the Entitlement Order and the concurrent closing, and Ress cannot rely on the non-occurrence of those steps to dispute the effectiveness of the Obra Parties' tender.

58. Throughout the parties' dealings before August 18, 2026, Ress executed the Entitlement Order corresponding to a quarterly payment either on the same day as the payment or by the next day.

59. On August 20, 2026—two days after the Obra Parties made their payment for Policy Group 6—Ress still had not executed the Entitlement Order, so the Obra Parties sent a Notice of Material Default to Ress pursuant to Section 6.2 of the PSA (the "Counter-Default Notice"). The Obra Parties' Counter-Default Notice asserted that Ress's refusal to perform its ongoing obligations under the PSA, including its refusal to execute the Entitlement Order and transfer Policy Group 6 after accepting the August 18 payment, constitutes a material breach of the PSA.

60. The Counter-Default Notice demanded that Ress immediately perform its obligations under the PSA and triggered the twenty-day cure period under Section 6.2 of the PSA. The Counter-Default Notice further reserved all rights and remedies available to the Obra Parties, including the right to terminate the PSA, specific performance, indemnification, and monetary damages.

61. The Counter-Default Notice was delivered to Ress in Copenhagen by overnight courier on August 24, 2026. Ress's cure period therefore expired no later than September 13, 2026. Ress made no attempt to cure its default within that period, and Ress remains in material default.

62. As of the filing of this Amended Complaint on October 22, 2026, Ress has been in material default for no fewer than 65 days and has been in possession of the Counter-Default Notice for no fewer than 59 days.

63. On August 21, 2026, the Obra Parties received a "Notice of Termination" from Ress (dated August 19, 2026) stating: "Please take notice that the Agreement is hereby terminated." The Notice of Termination did not mention the $20,625,000 payment that Ress had received on August 18.

64. Ress's "Notice of Termination" unequivocally repudiated the PSA, including Ress's obligations to transfer Policy Groups 6 and 7.

65. In light of Ress's repudiation, the Obra Parties were excused from tendering the final Quarterly Payment Amount for Policy Group 7 at the September 30, 2026 closing. At the time of Ress's repudiation and through the scheduled September 30, 2026 closing, the Obra Parties were ready, willing, and able to pay that amount and would have paid it but for Ress's repudiation. Among other things, Holdco had just paid the full $20,625,000 Policy Group 6 installment on August 18, 2026.

66. Under Sections 4.1 and 4.2 of the PSA, Ress was obligated to execute the Entitlement Order and cause the transfer of the policies upon receipt of the Quarterly Payment Amount. But despite receiving a $20,625,000 payment from the Obra Parties on August 18, Ress refused to execute the Entitlement Order and refused to cause the transfer of the policies in Policy Group 6 to Holdco. Ress's refusal to do so constitutes a material breach of the PSA.

67. By purporting to terminate the PSA, Ress has kept the Obra Parties' $20,625,000 payment for Policy Group 6 without delivering a single policy in return. And by demanding that the Obra Parties "unwind this transaction and restore Ress to the status quo ante," Ress signaled that it intended to claim the policies it has already sold—policies for which the Obra Parties had paid Ress $123,750,000, and which Ress had transferred to Holdco without objection over the preceding year.

**H. *Ress's Termination Has No Contractual Basis***

68. Apart from bankruptcy (which has not occurred), Section 6.3 of the PSA permits Ress to terminate only upon "material default by Purchaser in the performance of its obligations" under the PSA that the Purchaser "fails to cure within twenty (20) days." Ress's purported termination of the PSA is ineffective because none of the three alleged "defaults" asserted in the Ress Default Notice satisfies this standard.

69. First, the payment default was timely cured by the Obra Parties' August 18, 2026 payment, which was tendered within the twenty-day cure period under Section 6.3 of the PSA. Accordingly, the payment default was fully remedied before Ress issued its Notice of Termination.

70. Second, the Cash Covenant requires Holdco to "maintain sufficient cash or cash equivalents on hand or have readily available to it" to satisfy its obligations. The Obra Parties deny that the Cash Covenant was breached, and the Ress Default Notice identified no basis for that

claim other than the timing of Holdco's payments. In any event, the Obra Parties' payment of the full $20,625,000 installment on August 18, 2026 demonstrates that the required funds were available to Holdco by that date, and any curable default under the Cash Covenant did not remain uncured after that payment.

71. Moreover, Section 8.1 of the PSA provides that indemnification "shall be the exclusive remedies of [Ress] for a claim by [Ress] against [Holdco] for a breach of the representations, warranties, covenants or agreements made by [Holdco] herein." Read together with Section 6.3, Section 8.1 means that a breach of a representation, warranty, or covenant that is not an uncured material default in the performance of an obligation within the meaning of Section 6.3 gives rise only to indemnification for "Losses," not termination. In other words, even if the Cash Covenant were somehow breached (and it was not) and such a breach were somehow distinct from the cured payment default, it would not be an uncured material default in performance under Section 6.3, and Ress's remedy would be limited to indemnification for "Losses" caused by the breach, not termination of the PSA. And, moreover, Ress suffered no "Losses" caused by, arising out of, or in connection with any alleged breach of the Cash Covenant.

72. Third, the Obra Parties deny that the SPE Representation was inaccurate when made and deny that they breached any obligation concerning RS4's ownership, control, structure, separateness, or bankruptcy-remoteness. To the extent Ress contends that the SPE Representation was inaccurate when made, that claim concerns a representation governed by Article 8 of the PSA, not an uncured material default in the performance of the Purchaser's obligations under Section 6.3. To the extent Ress contends that the Amendment imposes a continuing obligation concerning RS4's ownership, control, structure, separateness, or bankruptcy-remoteness, the Obra Parties, without conceding the existence or scope of any such obligation beyond what the Amendment

provides, deny that any breach occurred, that any alleged breach was material, that any alleged breach satisfied Section 6.3, and that any qualifying default remained uncured following notice. In either event, the alleged breach would not provide a basis for termination under Section 6.3, and Ress's contractual remedy would be limited as provided by Article 8. And, moreover, Ress suffered no "Losses" caused by, arising out of, or in connection with any alleged breach of the SPE Representation.

73. Because none of the above satisfies the standard set out in Section 6.3, Ress's purported termination is invalid. Moreover, the PSA contains no provision authorizing Ress to "suspend performance" of its obligations, and Ress did not invoke any closing condition under Section 3.1 of the PSA. Accordingly, Ress's purported suspension of performance, first announced in the Ress Default Notice, was extra-contractual and of no legal effect.

74. In addition, since its purported suspension of performance in July 2026, Ress has failed and refused to perform its continuing obligations under Article 5 of the PSA, including its obligations under Sections 5.1 through 5.4 to perform the required monthly calculations, to apply the true-up mechanism set forth in Article 5, and to pay the resulting amounts on the applicable Distribution Dates. The PSA contains no provision authorizing the suspension of these obligations.

**I. *The Obra Parties Are Suffering Ongoing Harm from Ress's Misconduct***

75. Ress's breaches of the PSA—its present failure to transfer Policy Group 6, its stated intention not to transfer Policy Group 7, and its failure to perform obligations under Article 5—have deprived and will deprive the Obra Parties of the benefits of their bargain under the PSA and the Amendment.

76. Ress's purported termination of the PSA, its pre-litigation demand that the Obra Parties "unwind this transaction," and its claimed right to recover the policies previously

transferred to the Obra Parties have impaired the marketability and value of the policies in Policy Groups 1 through 5—policies that the Obra Parties have the right to sell—creating the need for the declaratory relief sought below.

77. In the alternative to recovery of the $20,625,000 Policy Group 6 payment, the Obra Parties are entitled to benefit-of-the-bargain damages with respect to Policy Group 6, and they are further entitled to benefit-of-the-bargain damages with respect to Policy Group 7, in each case measured as the market value of the specifically identified policies in the applicable Policy Group at the time of Ress's breach or repudiation, less the applicable contract price to the extent not paid or refunded, and net of any other required offsets, to the extent recoverable under the PSA and applicable law and excluding any category of damages barred by the PSA, in an amount to be determined at trial.

78. Ress's purported termination and its claimed right to reclaim the assets the Obra Parties acquired under the PSA have also impaired the marketability and value of those assets, a harm for which the Obra Parties seek damages and declaratory relief, as set forth herein.

79. The Obra Parties have therefore incurred substantial damages as a result of Ress's breaches. Those damages include, pleaded in the alternative where indicated and net of one another so that there is no double recovery:

a. as direct contract damages, return of the $20,625,000 that Holdco paid for Policy Group 6 and that Ress accepted and retained without transferring Policy Group 6, in the alternative to the expectation damages for Policy Group 6 described in subparagraph (d);

b. as direct damages, amounts payable to the Obra Parties under the true-up mechanism of Sections 5.1 through 5.4 of the PSA that Ress has failed to pay

on the applicable Distribution Dates;

c. to the extent recoverable as direct damages under the PSA, damages resulting from the impairment of the marketability and value of the policies purchased under the PSA created by Ress's claims to them;

d. expectation damages for the undelivered Policy Group 6 policies, in the alternative to subparagraph (a), and for the Policy Group 7 policies, each measured as described in paragraph 77, net of any amount refunded and any other required offsets, and only to the extent recoverable under the PSA and applicable law;

e. attorneys' fees and costs recoverable under the PSA and applicable law; and

f. pre- and post-judgment interest.

80. The Obra Parties are incurring, and will continue to incur, damages, legal fees, and expenses in amounts yet to be determined.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION: BREACH OF CONTRACT

81. The Obra Parties repeat and reallege the allegations contained in paragraphs 1 through 80 as if fully set forth herein.

82. This Cause of Action seeks compensatory damages and other monetary relief arising from Ress's material breaches of the PSA.

83. The PSA constitutes a valid and binding contract, under which the Obra Parties performed their obligations, including by timely curing the late Policy Group 6 payment, or were excused from performance.

84. The Amendment constitutes a valid and binding contract.

85. As alleged herein, Holdco paid the Quarterly Payment Amount of $20,625,000 to Ress on August 18, 2026, and simultaneously delivered to Ress an Entitlement Order executed by Holdco and tendered to Ress for its execution for Policy Group 6.

86. Under Sections 2.2(c), 4.1, and 4.2 of the PSA, upon receipt of the Quarterly Payment Amount, Ress was obligated to sell, assign, transfer, and convey to Holdco all right, title, and interest in and to the policies in Policy Group 6, to execute the Entitlement Order, and to cause the transfer of Policy Group 6 to Holdco.

87. Ress materially breached these obligations under the PSA by refusing to execute the Entitlement Order, and refusing to cause the transfer of the policies in Policy Group 6 to Holdco, while unjustifiably retaining the Obra Parties' $20,625,000 payment.

88. Ress has also breached Article 5 of the PSA by failing, since its purported suspension of performance in July 2026, to perform the monthly calculations required by Section 5.1, to apply the true-up mechanism set forth in Section 5.3, and to pay the resulting amounts on the applicable Distribution Dates as required by Section 5.4.

89. Because Ress's retention of the $20,625,000 payment while refusing to transfer Policy Group 6 is a material breach of the PSA that has not been timely cured, the Obra Parties are entitled to recover, as direct contract damages and in the alternative to expectation damages for Policy Group 6, the $20,625,000 paid for Policy Group 6, together with interest and any other amounts recoverable for Ress's breaches under the PSA and applicable law.

90. As a direct and proximate result of Ress's breaches, the Obra Parties have been damaged in an amount to be determined at trial, consisting of compensatory damages including the following, pleaded in the alternative where indicated and net of one another so that there is no double recovery:

a. as direct contract damages, return of the $20,625,000 payment that Ress accepted and retained without transferring Policy Group 6, in the alternative to the expectation damages for Policy Group 6 described in subparagraph (d);

b. as direct damages, amounts payable to the Obra Parties under the true-up mechanism of Sections 5.1 through 5.4 of the PSA that Ress has failed to pay on the applicable Distribution Dates;

c. to the extent recoverable as direct damages under the PSA, damages resulting from the impairment of the marketability and value of the policies purchased under the PSA created by Ress's claims to them;

d. expectation damages for the undelivered Policy Group 6 policies, in the alternative to subparagraph (a), and for the Policy Group 7 policies, measured as the market value of the specifically identified policies in the applicable Policy Group at the time of Ress's breach or repudiation, less the applicable contract price to the extent not paid or refunded, and net of any other required offsets, to the extent recoverable under the PSA and applicable law and excluding any category of damages barred by the PSA;

e. the Obra Parties' attorneys' fees, costs, and expenses recoverable under the PSA and applicable law; and

f. pre- and post-judgment interest.

**SECOND CAUSE OF ACTION: UNJUST ENRICHMENT (IN THE ALTERNATIVE)**

91. The Obra Parties repeat and reallege the allegations contained in paragraphs 1 through 90 as if fully set forth herein.

92. The Obra Parties plead this Cause of Action in the alternative to the First Cause of Action.

93. On August 18, 2026, Ress received $20,625,000 from the Obra Parties as payment for Policy Group 6 pursuant to the PSA.

94. Ress gave nothing to Holdco in exchange for that payment. It did not execute the Entitlement Order and did not direct Wilmington Trust to transfer the policies in Policy Group 6.

95. Ress disputes the validity and enforceability of the PSA and seeks its rescission.

96. As of the date of this Amended Complaint, Ress refuses to return the Obra Parties' payment.

97. Ress has thus been enriched by at least $20,625,000 at the Obra Parties' expense.

98. Solely if and to the extent the PSA is held to be unenforceable, rescinded, or terminated, or otherwise held not to govern the Obra Parties' payment of $20,625,000 in exchange for the policies in Policy Group 6, the Obra Parties are entitled to restitution in the amount of that payment plus interest from August 18, 2026, net of any amount recovered on the First Cause of Action. Equity and good conscience do not permit Ress to keep the Obra Parties' money, and to refuse to deliver the policies in Policy Group 6.

## THIRD CAUSE OF ACTION: MONEY HAD AND RECEIVED (IN THE ALTERNATIVE)

99. The Obra Parties repeat and reallege the allegations contained in paragraphs 1 through 98 as if fully set forth herein.

100. The Obra Parties plead this Cause of Action in the alternative to the First Cause of Action.

101. On August 18, 2026, Ress received $20,625,000 from the Obra Parties as payment for Policy Group 6 pursuant to the PSA.

102. Ress gave nothing to Holdco in exchange for that payment. It did not execute the Entitlement Order, and did not direct Wilmington Trust to transfer the policies in Policy Group 6.

103. Ress disputes the validity and enforceability of the PSA and seeks its rescission.

104. As of the date of this Amended Complaint, Ress refuses to return the Obra Parties' payment.

105. Ress has thus benefited from at least $20,625,000 at the Obra Parties' expense.

106. Solely if and to the extent the PSA is held to be unenforceable, rescinded, or terminated, or otherwise held not to govern the Obra Parties' payment of $20,625,000 in exchange for the policies in Policy Group 6, the Obra Parties are entitled to restitution in the amount of that payment plus interest from August 18, 2026, net of any amount recovered on the First or Second Cause of Action. Equity and good conscience do not permit Ress to keep the Obra Parties' money, and to refuse to deliver the policies in Policy Group 6.

**FOURTH CAUSE OF ACTION: DECLARATORY JUDGMENT**

107. The Obra Parties repeat and reallege the allegations contained in paragraphs 1 through106 as if fully set forth herein.

108. An actual, justiciable controversy exists between the Obra Parties and Ress as to the validity of Ress's purported termination of the PSA, and the effectiveness of the Obra Parties' August 18, 2026 cure payment.

109. Likewise, an actual, justiciable controversy exists between the Obra Parties and Ress as to whether Ress materially breached the PSA by refusing to transfer Policy Group 6 after accepting the Obra Parties' payment and failing to cure that breach, and as to whether Ress has any right to rescind the PSA or to reclaim the policies that the Obra Parties purchased.

110. Apart from bankruptcy, the only ground identified in Section 6.3 of the PSA on which Ress may terminate the PSA is an uncured material default by the Purchaser in the performance of its obligations under the PSA that the Purchaser fails to cure within twenty (20)

days after receiving written notice of such default.

111. Ress's purported termination of the PSA has no contractual basis, since the Obra Parties cured the payment default identified in the Ress Default Notice within the required cure period.

112. The remaining purported defaults alleged by Ress cannot serve as the basis for termination of the PSA, because they: (1) do not constitute uncured material defaults in the "performance of [Holdco's] obligations" within the meaning of Section 6.3; (2) did not occur or, to the extent curable, were cured; and/or (3) to the extent they do not satisfy Section 6.3, give rise only to such contractual remedies as are provided by Article 8 of the PSA.

113. By contrast, Ress materially breached the PSA by refusing to transfer the assets in Policy Group 6 to Holdco after accepting the $20,625,000 payment, then failed to cure that breach within the twenty-day period provided by Section 6.2 of the PSA after receiving the Counter-Default Notice. Ress's Notice of Termination was ineffective as a termination under Section 6.3, but it was a positive and unequivocal repudiation of Ress's remaining obligations under the PSA. The Obra Parties have elected to treat Ress's uncured material default and repudiation as a total breach, which discharged the Obra Parties' remaining executory obligations under the PSA, including any obligation to pay the final Quarterly Payment Amount for Policy Group 7. The closings for Policy Groups 1 through 5 were completed, and ownership of those policies remains with the Obra Parties. Any potentially inconsistent monetary remedies sought herein, including return of the Policy Group 6 payment and expectation damages for Policy Group 6, are pleaded solely in the alternative and net of one another.

114. The Obra Parties are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that: (a) the payment of $20,625,000 to Ress on August 18, 2026 constituted a

timely and effective cure of any alleged payment default within the meaning of Section 6.3 of the PSA; (b) Ress's purported termination of the PSA dated August 19, 2026 is invalid and of no force or effect; (c) Ress materially breached the PSA by refusing to transfer Policy Group 6 to Holdco after accepting payment, and failed to timely cure its breach; (d) Ress's uncured material breach and repudiation of the PSA discharged the Obra Parties from any further obligation to perform under the PSA, including any obligation to pay the Quarterly Payment Amount for Policy Group 7; and (e) Ress has no right to rescind the PSA or to reclaim the policies in Policy Groups 1 through 5 that were transferred to the Obra Parties under the PSA.

## PRAYER FOR RELIEF

WHEREFORE, the Obra Parties respectfully request that this Court enter judgment in their favor and against Ress:

a. On the First Cause of Action, an award of damages in an amount to be determined at trial, including return of the $20,625,000 Policy Group 6 payment as direct contract damages or, in the alternative, expectation damages for Policy Group 6; expectation damages for Policy Group 7; direct damages under Article 5 of the PSA; and to the extent recoverable as direct damages under the PSA, damages resulting from the impairment of the marketability and value of the policies purchased under the PSA created by Ress's claims to them, pleaded in the alternative where indicated and net of one another as set forth in paragraph 90;

b. In the alternative, on the Second and Third Causes of Action, awarding restitution of $20,625,000 to the Obra Parties, net of any amount recovered on the First Cause of Action;

c. On the Fourth Cause of Action, a judgment declaring that: (a) the Obra Parties'

payment of $20,625,000 on August 18, 2026 constituted a timely and effective cure of any alleged payment default within the meaning of Section 6.3 of the PSA; (b) Ress's purported termination of the PSA dated August 19, 2026 is invalid and of no force or effect; (c) Ress materially breached the PSA by refusing to transfer Policy Group 6 to Holdco after accepting payment, and failed to timely cure its breach; (d) Ress's uncured material breach and repudiation of the PSA discharged the Obra Parties from any further obligation to perform under the PSA, including any obligation to pay the Quarterly Payment Amount for Policy Group 7; and (e) Ress has no right to rescind the PSA or to reclaim the policies in Policy Groups 1 through 5 that were transferred to the Obra Parties under the PSA;

d. Awarding pre- and post-judgment interest on all such damages and amounts awarded;

e. Awarding costs and expenses incurred in this action, including attorneys' fees, in an amount to be determined at trial; and

f. Awarding such other, further, and different relief as the Court deems just and proper.

Dated: New York, New York
October 22, 2026

*<u>/s/ Kevin J. O'Brien</u>*
Kevin J. O'Brien
**KING & SPALDING LLP**
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Phone: (212) 556-2100
kobrien@kslaw.com

*Attorneys for Counterclaim Plaintiffs OLF RS Holdco, LLC and RS 4 SPV LLC*